ALMON, Justice.
A boundary line dispute brought these parties to court. After John Barratt Ru-dulph placed markers along what he considered his east property line, Julio Corte, Jr., filed this action to have the court determine his west property line. The court fixed the line as advocated by Mr. Corte, thereby encroaching on the property Mr. Rudulph thought he owned. Mr. Rudulph appeals.
The property in question is bayfront property on Bear Point, in Baldwin County, Alabama. Both parties trace their title to E.L. Higdon. Higdon conveyed two parcels to N.B. Rudulph (Mr. Rudulph’s uncle) in 1918. Higdon conveyed one parcel that Mr. Corte now owns to his father, Julio Corte, Sr., and F.C. Griffin in 1936. Higdon’s heirs conveyed a larger parcel to F.C. Griffin in 1949; Mr. Corte now owns this parcel, and the border between it and Mr. Ru-dulph’s property is the subject of this dispute: the parties agree on the point where the line begins on the bay, but Mr. Corte contends that it runs 17½ degrees west of north, while Mr. Rudulph believes it runs only 12V4 degrees west of north. At the rear of the property the line advocated by Mr. Corte and determined by the trial court is about 93 feet west of the line as Mr. Rudulph views it. (See Appendix.)
The property description in the deed to N.B. Rudulph reads:
*459 “That certain piece or parcel of land located in the northwest quarter of the northeast quarter, section two (2) township nine south (9-S), Range five east, (5E) on Bear Point, fronting Southward seventy five (75) feet on Bay Oronoco and extending back northwardly of uniform width three hundred (300) feet, more particularly described as beginning at a pine tree on the northern margin of Bay Oro-noco and running northwardly 17½ degrees west 300 feet; thence westwardly 17½ degrees south, 75 feet; thence south-wardly 17½ degrees east 300 feet; thence eastwardly 17½ degrees north, 75 feet to the point of beginning, being part of the land known as the Samuel Suarez grant, and heretofore owned by J.M. Danley, Lemuel Walker Sr., and grantor E.L. Higdon, by whom said land was occupied as a residence.
“Also,
“That certain lot or parcel of land beginning at a pine stump on the margin of Bay Oronoco and at the southeast corner of my above described lot and running 1320 feet north 17½ degrees west, thence 330 feet east 17½ degrees north, thence 1320 feet south 17½ degrees east, to the said Bay Oronoco; thence 330 feet west, 17½ degrees south to the place of beginning. This lot being a part of the northwest quarter of the northeast quarter of section two (2) in township nine south (9S) of range five east (5E) and containing ten (10) acres. This lot is known as a part of the Samuel Suarez grant and was owned in turn by Jas. M. Danley, Wilmer Walker and H.M. Low, being the Ten (10) acres adjoining the above described property on the east, together with all improvements, rights, fixtures and appurtenances thereunto belonging or in anywise appertaining.”
In July 1936, Higdon conveyed to Julio Corte, Sr., and F.C. Griffin the following piece of property:
“From the northwest corner of section 2, township 9 south, range 5 east, run east 1409 feet to a stake on the township line; thence run south 12 degrees 15 minutes east 604 feet to a very large pine stump on the beach; thence north 64 degrees 15 minutes east 530 feet to a stake on the beach at approximate high water mark; thence north 17 degrees 30 minutes west 300 feet to a corner; thence north 64 degrees 15 minutes east 112 feet to a corner; thence south 17 degrees 30 minutes east to a corner on the beach; thence south 64 degrees 15 minutes to the point of beginning; also that land lying between the lands above described and Bay Oronoco enclosed within the above East and West lines extended to the Bay; RESERVING, however, a passageway along the bay in front of the said lands.
“Also a right and easement for ingress and egress to and from the said lands over and along a 30 foot strip lying immediately East of the East line of the lands above described to intersect with a 40 foot right of way extending north from the northeast corner of this property to the public road now used, and also a right of way and easement along a 40 foot strip of land lying immediately north of the north line of the lands above described.”
This parcel is 200 feet east of Rudulph’s east line and only runs 300 feet back from the bay, whereas Rudulph’s runs 1320 feet. Higdon conveyed two 100-by-300-foot parcels between Rudulph and Corte and Griffin: one to Eula Belle Baldwin in September 1936 and one to F.W. Hare on December 10, 1938. Hare’s lot adjoined Rudulph to the east and Baldwin’s lot lay between Hare and Corte and Griffin. Each of these deeds runs lines north 17 degrees 30 minutes west 300 feet back from a stake on the bay. These deeds also refer to a forty foot easement or street bordering the lots on the north.
On June 10, 1949, Higdon’s heirs conveyed to F.C. Griffin a parcel described as follows:
“From the Northwest corner of Section 2, Township 9 South, Range 5 East, run East 1409 feet to a stake on the Township line, thence run South 12° 15' East 604 feet to a very large pine stump on the *460 beach, thence North 64° 15' East 642 feet to a stake on the beach at approximate high water mark, being the Southeast corner of the lot heretofore conveyed by E.L. Higdon and wife, to Julio Corte and F.C. Griffin by deed dated July 9, 1936, ... the point of beginning of the land hereby conveyed, thence North 64° 15' east 30 feet to a point, on the beach at high water mark, thence North 17° 30' West 990 feet, more or less to a point, on the south margin of highway # 160, thence South 64° 15' West and along the South margin of said highway 335 feet to a point, thence South 17° 30' East 630 feet to a point, thence North 64° 30' East 340 feet to a point, the place of beginning, meaning and intending to convey and conveying hereby all land owned by the Grantors lying between the properties of Corte and Griffin, Baldwin and Hare and highway # 160, except the 40 foot strip lying immediately North of the lots belonging to Corte and Griffin, Baldwin and Hare, and also conveying hereby the strip of land 30 feet in width lying immediately East of the Lot owned by Corte and Griffin.”
Griffin and his wife conveyed an undivided one-half interest in this property to Julio Corte (presumably Sr.) on July 13, 1949. On April 21,1976, Griffin’s widow conveyed her interest in the property to Julio Corte, Jr. On December 18, 1976, she executed a correction deed to Mr. Corte describing the west border as running from the highway south 17 degrees 30 minutes 650 feet, rather than 630 feet, as in the earlier deeds. This would take the property all the way to the north edge of the forty foot street mentioned in the Hare, Baldwin, and Corte and Griffin deeds.
Rudulph contends that the courses running 17½ degrees from the cardinal directions should be read as running 12 degrees 15 minutes from true north, east, south and west. He says this is so because his property description dates from the late 1800⅛ or early 1900’s when a surveyor would have used a compass and set the lines out according to magnetic north. Rudulph placed on the stand a surveyor, Perry A. Hand, who testified that the deviation of magnetic north from true north around the time of this survey was such that 17½ degrees west of magnetic north corresponded closely to 12¼ degrees west of true north.
This argument is made plausible chiefly by two circumstances apparent from the exhibits: the line running south 12 degrees 15 minutes east from the stake on the township line to the pine stump coincides with Mr. Rudulph’s west border, and Mr. Hand, while surveying the property for Mr. Ru-dulph in 1972, found an iron pin at a point that would be toward the north end of Mr. Rudulph’s eastern border using the 12¼ degree reading. Mr. Rudulph also introduced evidence that his western neighbors have accepted the 12¼ degree reading since 1944 or earlier, and he introduced as his Exhibit 1 a 1935 survey showing his east line parallel to his west line, with the latter shown as running “N 12° 18' W” from the old pine stump.
Mr. Corte points out that the 1935 survey was made by the Rudulph and Walker families — the Walkers owned the land to the west- — and there was no indication that Higdon approved the survey. A plat recorded in 1935 which purports to be a true copy of the 1935 survey does not, however, include the course of the Rudulph west line. Thus, Mr. Corte contends, there is no evidence that Higdon or the parties purchasing east of the Rudulphs’ property accepted or had notice that the 17½ degree readings might not be true readings. Mr. Corte further argues that any agreement made between Mr. Rudulph and his neighbors to the west cannot have any bearing on the dispute between Mr. Rudulph and Mr. Corte.
As proof that the parties treated the 17½ degree line as the property line, Mr. Corte entered evidence of a transaction between Mr. Rudulph’s mother, Sallie Rudulph, and F.W. Hare. A fence exists between the Rudulph and Hare property and runs along the 17½ degree line from the bay. The survey by Mr. Hand includes a note stating that “[a] long time resident [Mr. Rudulph’s sister Gertrude] reports that sometime in *461 the past an agreement was made to enable East neighbor to encroach on property by approximately 12' to 20'.” Mr. Corte, however, introduced a quitclaim deed from Sallie Rudulph to F.W. Hare dated December 29, 1938. The property description is the same as that of the parcel deeded by Hig-don to Hare on December 10, 1938; Hare’s west line is described with the 17 degree 30 minute course. The quitclaim deed recites:
“It is understood and agreed that as a part of the consideration hereof the said F.W. Hare is to locate the fence now standing on the East side of the property of the said Mrs. Sallie F. Rudulph, and rebuild the same along the west boundary line of the lot herein conveyed, and construct a fence from the Southwest corner of the above described lot so as to join a fence now standing on the South side of the property of the grantor so that grant- or shall have a complete fence on the southern boundary of grantor’s property[.] It is also understood and agreed that the said F.W. Hare is to have the right and privilege, at his own expense, to move the servant house of the said Mrs. Sallie F. Rudulph now located on or near the western boundary of the lot herein conveyed, to a new location on the property of the said Mrs. Sallie F. Rudolph [sic], which said location is to be later agreed upon between the said parties.”
Mr. Rudulph says this deed proves that the parties considered the 12-degree-15 minute line the original border between the Ru-dulph and Hare properties, and Mrs. Ru-dulph conveyed the wedge of land between the two lines in exchange for the various considerations recited and left unstated. A more plausible interpretation, and one in accord with the trial court’s finding, is that Mrs. Rudulph and Mr. Hare were aware of a discrepancy between the descriptions found in the deeds and the east line that the Rudulphs had been claiming. The face of the quitclaim deed lends itself to the conclusion that to settle the dispute on terms agreeable to both, Mr. Hare agreed to relocate the fence and connect it to Mrs. Rudulph’s southern fence if she would execute a quitclaim deed relinquishing claim to the more easterly line. As for the servant house, Mr. Rudulph testified that it was never much of a house and was destroyed in a storm before it was moved.
All of the deeds describe the lines running northwardly from the bay and dividing the various parcels from each other as taking a 17-degree-30-minute heading. The 1918 deed to N.B. Rudulph uses only 17½ degree readings; it begins at the pine tree and does not tie in to the section corner. All of the later deeds begin at the section corner, run along the section line to the west line of the large Rudulph parcel, and then proceed southwardly along that line to the old pine stump. This southwardly line, the western border of the Rudulph’s property, is given as “South 12° 15' East.” The descriptions then proceed along the bay, and when they turn northward to run a boundary line, they use the “North 17° 30' West” heading. Why, asks Mr. Corte, would the surveyors have used a true reading from the township line to the stump and then a magnetic reading from the bay to the northern end of the property and back?
Mr. Rudulph’s argument starts from the observation that his western line was clearly delineated at an early date — -the 1935 survey shows a road running along it— while the borderlines further east showed no signs of possession — indeed, Mr. Corte and Mr. Rudulph acknowledge that the disputed land contains nothing but live oaks and other wild growth. His contention, as we see it, is that for conveyances subsequent to the one to N.B. Rudulph, the parties wished to tie the description to something more obviously permanent than the hoary old pine stump. Thus, a surveyor may have started from the section corner, proceeded to the Rudulphs’ claimed west line, and taken a true reading of its course to the stump. After proceeding to the designated points on the bay, this surveyor might have run the boundaries along the old 17½ degree readings without realizing they were based on magnetic north.
*462 This scenario does not incline us to reverse the trial court, however. For one thing, it does not account for the fact that the deed to N.B. Rudulph gives his western line as running 17 degrees 30 minutes west of north, so a surveyor reading descriptions of the property boundaries in the area would have notice of the discrepancy. More important, speculation as to a possible source of the conflict cannot serve as grounds for reversal. The determination of a boundary line by a trial court will not be reversed on appeal unless it is palpably erroneous or manifestly unjust. Nelson v. Garrard, 403 So.2d 230 (Ala.1981); Snider v. Shirley, 341 So.2d 677 (Ala.1976). “Stated otherwise, the judgment of the trial court must be affirmed if, under any reasonable aspect of the case, its decree is supported by credible evidence.” Ray v. Robinson, 388 So.2d 957, 963 (Ala.1980).
Rudulph argues that Hand’s testimony concerning the discrepancy between magnetic north readings and true north readings was admissible to explain the meaning of a latent ambiguity in the property description, citing Guilmartin v. Wood, 76 Ala. 204 (1885). We agree that Hand’s testimony was admissible, but we do not agree that it was binding on the trial court. There was sufficient credible evidence that the parties have treated the 17½ degree reading as the true course, or at least that they have not possessed to the 12¼ degree line so as to contradict the face of the deeds. The trial court’s judgment is therefore due to be, and is hereby, affirmed.
AFFIRMED.
TORBERT, C.J., and FAULKNER, EM-BRY and ADAMS, JJ., concur.
*463 APPENDIX
[[Image here]]